Chief Judge Gregory and may it please the court. The question in this case is whether the court should defer to or otherwise uphold the BIA's determination that obstructing justice under section 460A of the Virginia Criminal Code is a crime involving moral turpitude or a CIMT. We contend that it should do neither. The board's decision is not eligible for either published nor directly controlled by a published decision and the Virginia statute is not a CIMT under the board's own precedent because it neither requires an intent to deceive a government official and criminalizes resisting arrest without any accompanying aggravated factor. Unless the court prefers otherwise, I will first address deference followed by the merits. In Martinez v. Holder, this court held that unpublished board decisions are not eligible for Chevron deference because they do not carry the force of law. While the court has recognized an exception to that rule for unpublished decisions that rely on a published decision, it does not address the precise extent to which an unpublished decision must rely on a published decision in order to be eligible for Chevron deference. We ask the court to join every other circuit that has considered the question and hold that unpublished decisions are only eligible for Chevron deference to the extent that they are directly controlled by a published decision. Such a holding is warranted for both legal and practical reasons. Under federal regulations, published board decisions must receive the vote of a majority of permanent board members. By contrast, unpublished board decisions are typically issued by a single member. So unless an unpublished decision is directly controlled by a published decision, there is no guarantee that it represents anything more than the grant deference to such a decision could potentially lead to a situation where a court is deferring to a minority position within the board. In our view, that would turn Chevron on its head. Now as a practical matter, the vast majority of decisions that the board issues are unpublished, and we know based on the sheer number of decisions that the board issues that the board members themselves are not capable of writing or extensively reviewing them. In fiscal year 2016, for example, the board issued 33,000 decisions. If you divide that number by the number of working days in the federal calendar, each member of the board issued or joined approximately eight decisions per day. In this case, the board member who signed the petitioner's decision, Roger Pauly, signed 17 other decisions on the same day that he issued the petitioner's case. Needless to say, as a matter of law, based on the number of opinions they release or join, that they must, a certain number must be improper or in error? No, Your Honor, we're not looking for any numerical threshold. I'm simply giving context to the reality of how many decisions that the board issues. I mean, our main argument is that an unpublished decision cannot be entitled to Chevron deference unless it is directly controlled by a published decision for the first reason I mentioned. Legally speaking, that it could be granting deference to the views of a single board member. So I'm simply trying to provide the court some context. But no, we are not asking for a numerical threshold. In this case, the government requests Chevron deference because the board decision in this case cited its published decision in matter of Gerardo. The government concedes, however, that matter of Gerardo is distinguishable because it does not require an element of deceit. The statute in that case, unlike the statute in this case, required an intent to a false statement or a forged writing. So if the court agrees that an unpublished decision is not eligible for Chevron deference unless it is directly controlled by a published decision, it must necessarily decline to afford Chevron deference in this case. If the court agrees that the decision is not eligible for Chevron deference, we would also ask that it decline to afford deference under Skidmore. To warrant Skidmore deference, an agency decision must be persuasive, it must be thorough, and it must be consistent with prior agency positions. The board's decision in this case was none of those things. The board's entire analysis consisted of two paragraphs that did not cite a single decision of any Virginia court. The board relied on matter of Gerardo without even acknowledging that that statute required an element of deceit, and it did not explain why it found an intent to obstruct a government official standing alone was sufficient to qualify as a CIMT. But didn't Gerardo deal with a narrower range of conduct than the Virginia statute we're looking at? Yes. Gerardo, the statute in Gerardo required a perpetrator to intend to mislead a public official by means of a false statement or a forged writing. So that is why we think that decision is in a posset and not controlling in this case. And we think most importantly for purposes of Skidmore, just two months prior to issuing the decision in my client's case, the board issued a decision finding a very similar Oklahoma statute was not a CIMT. So we would submit that this case is a quintessential example of a decision that is not deserving of Skidmore deference either. If the court has no questions about deference, on the merits, the same reason why matter of Gerardo is not controlling is why the statute in question is not a CIMT in the first place. For more than 50 years, the board has held that an intent to obstruct a government official or function is only a CIMT when it is accomplished by, quote, deceit, graft, trickery, or dishonest means. And we list those cases on pages 26 and 27 of our opening brief. If intending to obstruct a government official was itself sufficient to involve moral intrepidude, the board, of course, would have had no need to also refer to deceit, graft, trickery, or dishonest means. For this very reason, the Third Circuit recently held in Ildefonso Candelario that a very similar Pennsylvania statute was not a CIMT. That case was decided after the briefs were submitted, but we notified the court of it through a 28 JLUT. The statute in that case made it a crime to, quote, intentionally obstruct, impair, or pervert the administration of law or other governmental function. As in this case, the board relied on matter of Gerardo in finding that statute to be a CIMT. But when the case went before the Third Circuit, the government conceded that matter of Gerardo was not controlling and that, therefore, the board's decision was not entitled to Chevron deference. And the Third Circuit went on to hold that the statute was not a CIMT precisely because the obstruction in question did not have to be accomplished by deceit, graft, trickery, or dishonest means. Now, the government has not responded to our 28 JLUT, but we see no basis to distinguish the statute at issue in the Third Circuit case from the statute at issue in this case. Even the types of prosecutions are highly similar. So, for example, in Pennsylvania, the statute has been used to secure convictions against a defendant who intimidated a meter maid by shouting profanities at her and against a group of protesters who obstructed police officers by chaining themselves together to block an intersection. Under the Virginia statute at issue in this case, convictions have been secured against a motorist who refused to roll down her window for nine minutes to allow an officer to test the darkness of her window tint and against a layman who refused to leave counsel's table in a courtroom because his acquaintance had granted him power of attorney. Now, we recognize that members of society may have a duty not to obstruct government officials who are simply trying to do their jobs, but to the extent such a duty exists, it is a civic duty, not a moral duty. Whereas crimes like murder, rape, and theft involve moral turpitude because they are inherently wrong, failing to obey the instructions of a government official does not implicate any moral value beyond the duty to obey the law. Likewise, fraud and deceit have always been the hallmark of moral turpitude because they are the sign of an evil mind. The types of cases prosecuted under Virginia statute involve defendants whose conduct is plainly disrespectful and obnoxious, but in no sense could it be described as base, vile, or depraved, which is, of course, the test for a crime involving moral turpitude. We would submit that the conduct at issue in the Virginia cases we cite is more analogous to disorderly conduct than it is to what we typically think of when we envision instruction of justice. So the cases we cite do not involve defendants who are attempting to actively thwart an ongoing investigation or judicial proceeding. They involve defendants who passively refuse to obey the instructions of law enforcement officers. If the board was correct that Virginia's obstruction statute is categorically a CIMT, we would expect that the government could point to at least one other case in which similar conduct has been found to involve moral turpitude, but it hasn't. Neither the board nor the attorney general has cited a single case in which the intent to obstruct a government official standing alone has been found to involve moral turpitude. In addition to lacking an element of deceit, the Virginia statute is not a CIMT for an entirely separate reason, which is that it criminalizes simple resisting arrest without any aggravating circumstances. Under a separate line of cases, which includes the matter of Logan and the matter of Dinesh, the board has held that resisting arrest is only a CIMT when it is accompanied by an aggravating circumstance, such as use of a deadly weapon or infliction of injury upon the officer. No such factor is required to violate the Virginia statute at issue in this case. It criminalizes mere token resistance, such as pulling away from an officer's grasp. The government is correct that Virginia does have a separate statute that criminalizes resisting arrest, but that statute was not enacted until 2003. And prior to 2003, individuals who resist arrest were commonly charged with obstructing justice under the statute at issue in this case. So there remains an overlap between the two statutes, and for that reason, the board should have analyzed Petitioner's case under its line of precedent involving resisting arrest. If the court does rule in our favor, we ask that its opinion make clear that the government must facilitate the return of Petitioner to the United States. Where is your authority for that? We think it would be inherent in the court's Article III authority, in the same way that this court has ordered the government to release aliens from custody in their decisions when they dismiss charges of removability. If your client was brought back to the United States, then what would happen? Then the government could detain him, as it was doing while his removal proceedings were pending. If the court finds that it was not a CIMT, then he would at least be eligible to seek a bond before the immigration judge, which he was previously unable to do. But the proceedings would simply resume where they left off. Have you gotten any case law that says it recognizes this ability to bring someone back to the United States? I do not believe there is case law either way. I believe this is an issue of first impression. You want to bring him back and then put him into custody? We would ask for... No, you want to get him out of custody. That's how it would work. All we ask is that the court make clear that the government cannot block him from returning to the United States. Once he returns to the United States, the government has authority to detain him, as it was previously doing. It's a little different than saying the government doesn't have authority to block him from returning to the United States. It's different than ordering the government to bring him back to the United States. You would agree, wouldn't you? I certainly agree. But the only order we're seeking is that the government not prevent the petitioner from returning to the United States. I misread your papers. Yeah, I apologize for any confusion. I'm not sure what you mean when you say not prevent him from returning to the United States. If he's sneaking across the border, we can't... No, we're certainly not asking the court to condone an illicit entry. But for example, for the petitioner to return to the United States, he may need a boarding letter from the embassy in El Salvador. So we would want to make sure that the embassy not refuse to issue such a letter. How would we accomplish that? By simply including an order in the court's decision saying that the petitioner has a right to resume his removal proceedings in the United States. Well, I'm not sure that's going to accomplish that, but I hear you. It strikes me that this is something the State Department deals with. It's a different branch of government. It is a different branch of government, but I think any decision on this court would be binding on all offices within the executive branch. Well, I suppose it would be in the spirit of the person who's before the colored courts don't lose their right to appeal because they've been deported. Precisely. This case is certainly not moot simply because the petitioner is in El Salvador. That's for sure. Yes. So therefore, to give our opinion in any way at all, the point is we'd have to exercise some inherent power, because otherwise we've wasted our time. Otherwise, this court could be rendering an advisory opinion. Right, exactly. But the question I have is this. Is that all you need? What happens if Because apparently, your client wants to go back to status ante, and that is to say now you can apply for the adjustment in status that he otherwise would have been available to apply for but for this, what we're here for, assuming that you went on that. But won't he have another problem with that continuous presence in the country now that he's deported? And to also say you won't credit that against him? My reading of the regulations is that the period of continuous presence runs until the filing of the application. So it's already run. So it's already filed. Right, the application has already been filed. If the government were to make that argument, you know So he'll go back to that point? Right, right, yes. I'm just thinking out loud that this may not even be relevant. If we said, okay, we'll give you a plane ticket back to the United States. You're going to arrive in the United States and you're going to be taken into custody. Your client wants that? Yes, he would like to return to the United States because he would have the opportunity to seek a bond. And to apply for the Yes, and of course to apply for the underlying form of relief. You're not asking us to give him a plane ticket. No, we're not asking for the court. One more time, what exact relief do you want from us? We would like the court to include in its opinion a statement that the government cannot prevent the petitioner from returning to the United States and must facilitate his return to the United States by issuing any necessary documents for him to physically return. Perhaps I can articulate it more clearly during rebuttal. So as soon as he gets returned, he's in custody? Yes, the government would, yes. But unlike before, he would be eligible to seek a bond. Okay. Thank you. Vanessa Otero. Good morning, may it please the court. Vanessa Otero on behalf of the Attorney General. Before I can get the question, which is always a problem, maybe you can address the government's position vis-a-vis the Third Circuit case and this one. Sure. The government's position is that the Third Circuit case in Edith Bonso Candelario is highly inapplicable here. As the court knows, that dealt with a completely different statute, Pennsylvania law, that had an element of fraud in it. And this concerns Virginia law, which doesn't explicitly have an element of fraud in it. In that case, it was also in a different procedural posture. The government was seeking remand, filed a motion to remand. The Third Circuit denied the motion. So the case went to briefing, and then the government briefed remand to the court. This statute is a little bit broader than the Pennsylvania statute, as I mentioned earlier. It doesn't explicitly require the use of fraud in order to commit the obstruction. And the Pennsylvania statute, as I believe Judge Traxler mentioned, is a lot narrower. What approach would you take in analyzing the Virginia statute? A categorical approach? Yes, the categorical approach definitely applies here, and it was correctly applied by the board. Go ahead. Please tell me how you come up with the Virginia law would be one that requires it. When I was practicing law in Virginia, we would call crimes of moral turpitude or lying, cheating, and stealing. What is lying, cheating, and stealing for obstruction of justice? Well, obstruction of justice, backing up, crimes involving moral turpitude, they fall into various categories. You have, let's say, rape could be a crime involving moral turpitude. Like you mentioned, lying, cheating, and stealing could be a crime involving moral turpitude. That doesn't mean that obstruction of justice under Virginia law isn't. I agree with that. Rape is a vicious moral attack on someone's person. Absolutely. But go ahead. What are the other ones that are required? Well, let me get to the analysis that the court should apply here is categorical analysis. That means taking the elements of the crime and comparing that to the generic definition of crime involving moral turpitude, which this court has held and which the board applied here, is the inherent base vial. What kind of conduct do we apply that to the statute and the elements? Is it the least or the most? It's the least. Because you went to the most because you went to rape. Correct. Well, it's the least culpable conduct. Okay. For example, would it include not rolling your window down when a police officer says, hey, roll your window down. You take like nine minutes. Would that be enough? Well, that would entail applying what's called the realistic probability test. And I'll get to that in a second. Realistic probability. I can tell you. Virginia obstruction of justice might include a police officer on the scene. You'll stand in the face of a police officer. He says, listen, stand over there because I'm talking to a person. I'm not going to tell you again. And you continue, that's obstruction of justice. And you get tagged for that. That's very common in Virginia. I can tell you that. Well, if that were to have been, if a person were to have been convicted of that crime in Virginia, that would have required. If they were. If in your hypothetical, a person was actually. Assuming that they were. Assuming that they were convicted under Virginia statute for that conduct, that would have meant that a jury would have found that that person had the intent to obstruct justice. Intent is not the question. It is. In this circuit, it is. Intent makes it more alternative? Well, in Sotny Cow, which is a 2017 decision. Well, every crime has an intent element. Well, the intent here is not to. It may not be specific in all crimes, but it's always an intent, isn't it? There is always an intent. But here, the intent is very specific to obstruct justice, not just to commit a crime. You mean here? Here what? Here in this, concerning this particular Virginia statute, which this court had. No, it doesn't. It doesn't. What element requires that? What do you mean, what element requires that? I mean exactly the statute. The statute says a person, without just cause knowingly, obstructs a judge, juror, prosecutor, witness, or law enforcement officer in the performance of his or her duties, or fails to cease such obstruction when requested by that person. Now, this court in Graham v. Gagnon, a 2016 decision, analyzed this exact Virginia statute in a different context, under section 1983. And it recognized that under Virginia law, in order to be convicted of obstruction of justice, a person must do more than render an arrest more difficult or inconvenient. The Virginia statute requires actual hindrance or obstruction of a covered actor. It does not include an instance where a person fails to fully cooperate with an officer or makes his or her job more difficult. That's what this court said, speaking to this exact Virginia statute. And how does that further, hindrance, puts it in the category that it has to be more interpreted? It requires actually hindering the officer. The turpitude it comes into play with, in other words, a person who commits this crime has deliberately decided to prevent a judicial officer, such as yourself, or a law enforcement officer, from accomplishing his or her job, from performing his job. This is different than someone who's committing a theft. That person has the intent to rob, to take something for his or herself. That's, the intent there is different. The intent here is to prevent you from doing your job, to prevent a police officer from doing his or her job. And then it's just thwarting government function. So, for example, like civil disobedience, that's moral turpitude if you say, you know what, I'm protesting discrimination, and I'm not going to leave this sidewalk until this store integrates your calendar, your lunch calendar. And if you don't move, and an officer has to pick you up, that's moral turpitude to stay on the sidewalk. Your Honor, I can't speak to that hypothetical. I don't know if that falls within the... You said that's a deliberate hindrance. I'm stopping you from removing me because I'm protesting. Well, I don't know if... First of all, would that be obstruction of justice in a Virginia statute? I don't believe so. Why not? Because maybe you would have just cause to obstruct justice in that instance. Just cause? You're violating the law. The Virginia statute requires a person to have no just cause. Without just cause, intentionally obstructs you from doing your job. The very essence of not having just cause is breaking the law. I don't know if I agree with that. But also in your hypothetical, that there might be a First Amendment issue there. If you're protesting and you believe that you are doing something, there might be a First Amendment issue there. I'm not sure that that would fall within the Virginia statute. But the other point I wanted to make, and I don't know if the Court has any questions on our exhaustion argument, but a lot of the argument that Petitioner has raised in his brief and here today is that this particular obstruction of justice statute doesn't require the use of fraud or deceit or trickery. He never exhausted that before the Board. He never once mentioned that. This is the first time he's mentioning it here. And as this Court well knows, a Petitioner must raise all arguments before the Board, before it raises them here. And if he doesn't, the Court is jurisdictionally precluded from reviewing that argument. So the fact that this particular statute doesn't require the use of fraud doesn't make it not a crime involving moral turpitude. I'm not familiar, so maybe you can draw my attention to Fourth Circuit law that says you have to exhaust with particularity that you're suggesting here. He did argue that this obstruction of justice didn't constitute a CIMT, right? Correct. He did make the argument. And usually that's what I'm familiar with with regard to exhaustion. In Kapor, Laura V. Holder, a 2010 decision which is cited in our brief, the Court observed the well-established rule that, quote, an alien must raise... And the Court also said that the plaintiff there, or the person that was going to be adversely affected, acknowledges that he did not appeal the IJA's CAT determination to the BIA. Is there such an acknowledgement here? No, we're not saying that he didn't exhaust the general question of whether this statute is a CIMT, but we're saying that he didn't exhaust that particular argument. It's the basis of his entire brief, for the most part. And that's what we're asking the Court to find. I don't think that the case that you're citing goes to that argument. Okay, that's... Maybe you have a case, and I'd be interested in it because we would get rid of a whole lot more cases on exhaustion. That would be wonderful. If you hadn't spelled out exactly the rationale for which you're arguing. But I just don't think that's there in the law. Okay. Another point I'd like to make is, contrary to what Petitioner is arguing, Gerardo Delgado does apply here, and it is controlling. In that case, the Board didn't conclude that all obstruction crimes require an element of deceit. That doesn't mean that that case doesn't apply. What the Board held in Gerardo Delgado, let me get my hands on it there, is the person in that case must have the intent to disrupt the performance of a public servant's official duties. And it said, we have held that impairing and obstruction of function of a Department of Government by defeating its efficiency or destroying the value of its lawful operations by deceit, graft, or trickery is a crime involving moral turpitude. Now, just because the Virginia statute doesn't lay out that obstruction of justice must be committed by deceit, graft, or trickery, does it not make it a crime involving moral turpitude? Certainly, the crime can be committed through deceit, graft, or trickery. It's just not explicitly written in the statute. So, your position is that the controlling factor here is the intent to obstruct, impair, or pervert lawful operations of the government. Correct. Okay. If that is so, then what is the line between a crime of moral turpitude and any other crime? The intent. In any other crime, maybe the intent is to commit that particular crime. In this crime, it's the intent to prevent a judicial or law enforcement officer from performing his or her duties. In Mohammed, we particularly explain that there has to be some sort of moral value beyond merely the duty to obey the law. What's the moral value here? Allowing a law enforcement officer to enforce the law. That, it seems to me, sounds a lot like obeying the law. Your Honor, I respectfully disagree. I don't think it is. In one instance, a person is committing a crime, and their intent is to commit that crime. Here, the crime is, the person isn't obstructing justice by committing a theft. They're obstructing justice by disallowing you to do your job, by disallowing a police officer to do his job, to perform his duties. That's the crime. I hear what you're saying, but I don't see the distinction. I guess we're just talking past each other. Maybe my question isn't clear. So your basic argument is that to intentionally, to have the intent to obstruct an officer in court or whatever, that is per se a crime of moral turpitude. That's what you have to be arguing. That if that is your specific intent to hinder, pervert, or otherwise obstruct an officer in their duty, then that is per se a crime of moral turpitude. That has to be your argument. It is when the result of that intent is that you actually obstruct and hinder the officer from doing his or her job, which is what this Court said the Regenerate Statute requires. You put more than the statute requires. It has a result in it. It could be an attempt crime. But anyway, what you're saying is that if you accomplish it, that is moral turpitude. Exactly. All the time. Every instance. No matter how you accomplish that intent, it's always a crime of moral turpitude. That has to be your argument. The difference between that, what we've just been talking about, and what happened in Gerardo Delgado, which was upheld on appeal to the Third Circuit, is that in order to obstruct justice in Gerardo Delgado, you had to do it through deceit, fraud, or trickery. And in this case, it's not required. It's not explicitly required. That doesn't mean you can't do it through deceit, fraud, or trickery. No, but you're saying even if you don't do it through deceit, fraud, or trickery. Correct. Okay, so that if you speed in Virginia, you're intending to pervert the laws about speeding, that you sure are. No, because Virginia... You don't want them applying to you, so you're perverting them. I don't think you would be convicted of obstruction of justice by... You're impairing the operation of the government. That is the operation to enforce the speeding laws. Sure you are. But that's not obstruction of justice. You have to be... No, it's not. Right, so, but here what we're talking about is... It's under your argument. No, but what we're talking about here is obstruction of justice under the Virginia statute. You have to have no just cause, and you have to knowingly obstruct an officer from doing his duties. How is speeding doing that? The officer is trying to keep you from not speeding. He's chasing you. You start speeding a little bit, and then he's chasing you, and you don't slow down. Do you have just cause? If you don't have just cause to do it, and if a jury in Virginia finds you guilty of obstruction of justice, you've satisfied... That's a crime of moral turpitude. You've satisfied both elements that this circuit has said equal a crime involving moral turpitude, which is the requisite intent and reprehensible conduct, and that's what this circuit said. And there's a moral value involved in that. I believe there is. Yes, yes, Your Honor. And that's from disallowing a law enforcement officer from doing his job. So you've made racist... Ignoring blue light with the obstruction of justice. I'm sorry, Your Honor? The blue light, in terms of sorry, ignoring. The Rivers case, when you had to examine it in California, you're saying that if you ignore the blue light, the police officer running cold, coming after you, that's also obstruction of justice in Virginia. No, Your Honor, I disagree. Why wouldn't it be? The officer is trying to apprehend you, which is an act in furtherance of the law. You are speeding as fast as you can away from him or her, therefore, you are hindering the enforcement of law. Or obstructing, or interfering. I mean, that's behind you, correct? I don't agree that those facts would equal obstruction of justice, and I don't think that Petitioner has pointed to a case in which a person has been convicted of obstruction of justice with those facts. Why would it not? That's a good question, Your Honor. I don't have an answer for you. Okay. So if the Court has any further questions, I'll conclude. Can I? Sure. Go ahead. Absolutely. I was going to change subjects. Okay. I want to just try to find out about this idea of bringing Mr. Ramirez back if he were to prevail. Yes. Can you shed any light on what the procedure is if that were to be our decision? Your Honor, Mr. Ramirez conceded that he was removable. He filed a motion for stay removal, which was denied. He was then removed from the United States. Counsel hasn't provided any reason why he needs to come back to the United States at this point. If he came back, he would be here illegally because he has no relief from removal, and he's conceded that he can be removed. As far as the procedure for bringing him back, I don't know that personally. That would be something that would be handled, I'm assuming, by the Department of Homeland Security. For him to ask this Court to issue some sort of order for allowing him to do that, I think that would exceed a lot of authority. I think that would involve maybe the State Department, which I'm not associated with as well. And I think that if he wants his client to come back, that would best be handled after this PFR is granted or denied. And let's say it's granted and it goes back to the agency, I think they're in the best position to decide whether or not he should come back to the United States if they would, let's say, for example, need him to testify further on his application. There are some of the elements in his cancellation application that the immigration judge nor the board reached, specifically the hardship question. Maybe they would need more information from him on that, but maybe they wouldn't. Maybe they would decide that they've had enough and they don't need to talk to him any further or need any further evidence from him. But as far as the procedure for bringing him back, I don't know that personally. I would be happy to look into that further and file a letter brief. But counsel hasn't provided you with any reason or any sort of authority to back up his statement that that's what this court should do and that his client even deserves that. One of the reasons I'm asking this question is, I'm wondering if we do in these cases an advisory capacity. In other words, if the person's been removed and don't want to come back, should we be deciding their case? I don't think so. You haven't made any assertion about that, right? I was just glancing through your brief. We addressed that in a footnote. We addressed his argument in one of our last briefs. No, no, no. Not whether he's come back or not, but whether we have jurisdiction. This is going to be an advisory opinion. Do you make that contention in your papers? I don't think so, but I'm not sure that he made it a jurisdictional question either. Well, jurisdiction, you know, it's just a grab bag. Anybody can assert. You go, girl. Right. If you want to assert jurisdiction or lack thereof. All I'm asking is does the government make that argument? You didn't make it in your briefs, I don't think. Are you making it right now? The argument that the court doesn't have jurisdiction to issue that order? No. The argument that this would be futile, that we don't have any jurisdiction because there's nothing we can do. I don't believe we made that argument, no, Your Honor. And you're not making it now? I don't know the answer to the question. I don't know what the procedure would be. Ms. Otero, wouldn't that be the fair thing to do? I don't think so. He was removed pursuant to an awful order of removal. He conceded his removability. Right, because And he has no relief available to him. No, what I'm saying is this. This is hypothetical. If we ruled in his favor, what's the issue here? This issue. Yes. Right. When he was deportable, and because of this issue, though, he was deportable. Now, if he wins here, isn't it fair for him to go back? Go back, meaning go to a point where he can now raise whatever is available to him for adjustment, hardship, and those arguments that he was prevented from because of this little thing that we're dealing with right now that we resolved in his favor. Why would that be fair? You know who I was asking for a pay-for-his-ticket? They're saying that the government will not do anything to stop him from coming in the country. And since I was paroled into the country for the purpose of whether they want to lock him up, ice, whatever they want to do, apply for a bond, whatever. But he gets to go back and say, look, I'm now eligible to apply for this adjustment. You're right. It hasn't been decided whether he gets to or not. But he can't get to it if you're going to be on the other side. Everybody at the border said, excuse me, you can't come back in here to raise these adjustments. Wouldn't it be fair for him to be able to at least get back to where he was at that point? Not that he gets to stay permanently at all, but that he gets to raise that. That was denied him inappropriately if he ruled in his favor. Why would that not be fair? I don't think it's necessary because the agency still has enough information before it to decide his NACAR application. He was removable on a different charge. He conceded removability for a different reason because he was here without admission or parole. That's right. Right. But that doesn't end whether or not he would be eligible for other relief. Correct. But the agency might be able to decide that with the record as it stands now. Correct. But that's unknown to us, to you and I sitting here today. It's for the agency to decide whether it needs more information from him or not. The question here, whether or not his crime is or isn't a CIMT, only affects a small part of his cancellation application. There are other factors that the immigration judge would need to consider in order to determine that application, his eligibility for that relief. And isn't it best to decide for him to be able to further that while he's in his country? He's got seasoned counsel advocating for him who could do that on his behalf. Whether or not they would need him here physically to testify further is something that the agency could decide. But if we should decide for him, we should leave that option open to him, right? For him to come back? For him to come back if the agency needs that. Sure, and that's something that could be visited at that time. No, I understand what you're saying. So what you're saying is, okay, you can give him this option to come back if the agency needs his assistance. If he wins. Sure. Okay. Thank you. Mr. Winograd. If you would, would you try me again on this business about exactly what relief you would like and what you should avail him? Yes, Your Honor. We would simply ask the court to state in its opinion that the government must facilitate and cannot otherwise prevent the petitioner from returning to the United States and that he must be allowed to pursue his application for cancellation of removal from within the United States. I hope that addresses your concern. Are you familiar with any other situation where anybody has done that? I have not. I believe this is a question of first impression. But in terms of the court's authority, I would point it to two cases. Mohamed, the case that has been discussed earlier, and in Larios-Reyes v. Lynch. In both cases, the court ordered petitioners to be released from detention in their decisions upon finding that they were not subject to the Charter of Removability. So we think that's somewhat analogous. But we're not aware of any case in this or any other circuit that's directly on point. And so can you go back and sort of tie this in with Judge Traxler's question to your colleague about whether there's any relief thing in front of us? Yes, I want to put to rest any question about this court's Article III jurisdiction. Because at a minimum, a conviction for a crime involving moral turpitude has collateral consequences on an alien's future ability to return to the United States. So for example, if my client were to marry a U.S. citizen, he would be eligible for an immigrant visa. But for a conviction for a crime involving moral turpitude, that would render him inadmissible. So there's no doubt that the petitioner has standing, and this court has jurisdiction for Article III purposes. My response to Chief Judge Gregory's question was simply that preventing the petitioner from returning to the U.S. to pursue his application for cancellation would render this decision, this court's decision advisory, in a dead letter, so to speak. The government could otherwise simply thumb its nose at the court's decision. My question really was just to make sure we still have a live controversy. If the person is deported, removed, and doesn't want to come back, I'm not coming back. You know, I'm going to stay here. That should affect, I think, whether or not we can continue handling this case through our judicial system. My client desperately wants to return to the United States. It should be a simple matter to determine, which is just a statement, you know, that I wish to return to the United States or I wish to have this matter litigated. It will impact my future. The petitioner does want to return to the United States. That's why we filed a stay of removal. He never wanted to be deported in the first place. He has extensive family ties. Even the immigration judge said in his decision or urged the Department of Homeland Security not to deport the petitioner for humanitarian reasons. So he desperately does want to return. Just a few points. With regard to exhaustion, Judge Matsu, you are precisely correct. The exhaustion requirement does not require as high a level of specificity as the government claims. It requires aliens to raise general issues to the board, but not every conceivable sub-argument in support of that issue. Was he represented at the board? I'm sorry? Was he represented before the board? He was represented before the board. By you? Not by me. Second, even if the court believed that the petitioner had failed to exhaust the claims themselves, six out of seven circuits who address this issue have held that when the board addresses a matter sua sponte, that is sufficient for the exhaustion requirement. Here, the board held that the statute in question was categorically a CIMT. By holding it was categorically a CIMT, the board necessarily held that no scenario existed in which the statute was not a CIMT. So the board addressed the matter sua sponte. And then finally, there is, of course, a long-standing principle of statutory construction that favors judicial review of administrative action. So to the extent any uncertainty lingers in the court's mind about exhaustion, those doubts should be resolved in the petitioner's favor. If there are no further questions. Thank you, counsel. All right, we'll come down and recast and proceed to our last case for today.
judges: Roger L. Gregory, Diana Gribbon Motz, William B. Traxler, Jr.